Citation Nr: 1743995 
Decision Date: 09/18/17 Archive Date: 10/10/17

DOCKET NO. 16-05 365 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Houston, Texas


THE ISSUE

Entitlement to compensation under 38 U.S.C. § 1151 (West 2016) for liver disease, to include cirrhosis of the liver, liver transplant, and terminal cancer ("liver disease") due to VA medical treatment. 


REPRESENTATION

Veteran represented by: Texas Veterans Commission


ATTORNEY FOR THE BOARD

K. Anderson, Counsel





INTRODUCTION

The Veteran had active military service from March 1964 to March 1967. 

This claim comes to the Board of Veterans' Appeals (Board) from a February 2015 rating decision from the Department of Veterans Affairs (VA) Regional Office (RO) in Houston, Texas. 

The undersigned is granting the motion and advancing the appeal on the docket based upon advanced age. 38 C.F.R. § 20.900(c) (2016). 38 U.S.C.A. § 7107(a)(2) (West 2014).


FINDING OF FACT

The Veteran did not suffer a new or additional disability associated with treatment for liver disease as a result of VA treatment due to VA treatment due to carelessness, negligence, lack of proper skill, error in judgement, or some other instance of fault on the part of the VA, or as a result of an event that was not reasonably foreseeable. 


CONCLUSION OF LAW

The criteria for compensation under 38 U.S.C.A. § 1151 for cirrhosis of the liver, liver transplant, and terminal cancer have not been met. 38 U.S.C.A. § 1151 (West 2016); 38 C.F.R. 3.102, 3.159, 3.361, 17.32 (2016).


REASONS AND BASES FOR FINDING AND CONCLUSION

The Veteran asserted entitlement to compensation under 38 U.S.C. § 1151 for residuals of his currently diagnosed liver disease because of the gross neglect of a radiologist at the VAMC Houston that the Veteran believes prevented his primary care physician at the VAMC to properly diagnosis his current liver condition. 

Section 1151 compensation is awarded for qualifying additional disability in the same manner as if such additional disability were service-connected. The purpose of the statute is to award benefits to those Veterans who were disabled as a result of VA treatment or vocational rehabilitation. 38 U.S.C.A. § 1151 (a). 

For purposes of establishing entitlement to section 1151 benefits, a disability or death is a qualifying additional disability or qualifying death if the disability or death:

(1) was not the result of the Veteran's willful misconduct; and

(2) the disability or death was caused by hospital care, medical or surgical treatment, or examination furnished the Veteran under any law administered by the Secretary, either by a Department employee or in a Department facility as defined in section 1701(3)(A) of this title, and the proximate cause of the disability or death was-

(A) carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the hospital care, medical or surgical treatment, or examination; or

(B) an event not reasonably foreseeable.

38 U.S.C.A. § 1151 (a); 38 C.F.R. § 3.361 (a)-(d). 

First, there must be evidence of additional disability, as shown by comparing the Veteran's condition before and after the VA medical care in question. 38 C.F.R. § 3.361 (b). VA considers each body part or system separately. The additional disability must not be the result of the Veteran's willful misconduct. 38 U.S.C.A. § 1151 (a); 38 C.F.R. § 3.301 (c)(3).

Second, the additional disability must be caused by hospital care, medical or surgical treatment, examination, training and rehabilitation services, or compensated work therapy program furnished the Veteran by VA. 38 C.F.R. § 3.361 (c). Merely showing that a Veteran received care, treatment, or examination and that the Veteran has an additional disability does not establish cause. 38 C.F.R. § 3.361 (c)(1). In order for additional disability to be compensable under 38 U.S.C.A. § 1151, the additional disability must have been actually caused by, and not merely coincidental to, hospital care, medical or surgical treatment, or medical examination furnished by a VA employee or in a VA facility. 38 C.F.R. § 3.361 (c)(1). Additional disability caused by a Veteran's failure to follow properly given medical instructions is not caused by hospital care, medical or surgical treatment, or examination. 38 C.F.R. § 3.361 (c)(3). 

Third, with regard to causation, the proximate cause of the disability, as opposed to a remote contributing cause, must be 1) carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of VA in furnishing the hospital care, medical or surgical treatment, or examination; or 2) an event that was not reasonably foreseeable. 38 U.S.C.A. § 1151 (a)(1); 38 C.F.R. § 3.361 (d). 

With regard to carelessness or negligence, to establish that carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on VA's part in furnishing hospital care, medical or surgical treatment, or examination was the proximate cause of a Veteran's additional disability or death, it must be shown that the hospital care or medical or surgical treatment caused the Veteran's additional disability or death; and (i) VA failed to exercise the degree of care that would be expected of a reasonable health care provider; or (ii) VA furnished the hospital care or medical or surgical treatment without the Veteran's informed consent. 

Determinations of whether there was informed consent involve consideration of whether the health care providers substantially complied with the requirements of 38 C.F.R. § 17.32. See 38 C.F.R. § 3.361 (d)(1). Minor deviations from those requirements that are immaterial under the circumstances of a case will not defeat a finding of informed consent. Id. Consent may be express (i.e., given orally or in writing) or implied under the circumstances specified in § 17.32(b) of this chapter, as in emergency situations. Id. 

With regard to reasonable foreseeability, whether the proximate cause of a Veteran's additional disability or death was an event not reasonably foreseeable is in each claim to be determined based on what a reasonable health care provider would have foreseen. The event need not be completely unforeseeable or unimaginable but must be one that a reasonable health care provider would not have considered to be an ordinary risk of the treatment provided. In determining whether an event was reasonably foreseeable, VA will consider whether the risk of that event was the type of risk that a reasonable health care provider would have disclosed in connection with the informed consent procedures of 38 C.F.R. § 17.32. See 38 C.F.R. § 3.361 (d)(2). However, if the Board makes an initial determination that any additional disability was not caused by VA, the Board is not required to make a finding as to whether the event in question was reasonably foreseeable. See 38 C.F.R. § 3.361 (c); Loving v. Nicholson, 19 Vet. App. 96, 99-100 (2005). 

Thus, section 1151 contains two causation elements-a Veteran's disability must not only be "caused by" the hospital care or medical treatment he received from VA, but also must be "proximate[ly] cause[d]" by the VA's "fault" or an unforeseen "event." See 38 U.S.C.A. § 1151 (a)(1).

VA regulations provide that informed consent is the freely given consent that follows a careful explanation by the practitioner to the patient of the proposed diagnostic or therapeutic procedure or course of treatment the expected benefits, reasonably foreseeable associated risks, complications, or side effects, reasonable and available alternatives, and anticipated results if nothing is done. See 38 C.F.R. § 17.32 (c). Under 38 C.F.R. § 17.32 (d), the informed consent process must be appropriately documented in the medical record. In addition, signature consent is required for all diagnostic and therapeutic treatments or procedures that require the use of sedation, anesthesia or narcotic analgesia; are considered to produce significant discomfort to the patient; have a significant risk of complication or morbidity; or require injections of any substance into a joint space or body cavity. Id. 
In determining whether § 1151 compensation is warranted for a disability, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the Veteran prevailing in either event, or whether a preponderance of the evidence is against the claim, in which case the claim is denied. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; and Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

The Veteran's claim file underwent a thorough review by a VA examiner in November 2015 to determine whether is liver disability was caused by or worsened as a result of VA treatment; whether an additional disability resulted from carelessness, negligence, lack of skill, or similar incidence of fault on the part of the attending VA personnel; whether an additional disability resulted from an event that could not have reasonably been foreseen by a reasonable healthcare provider; or whether there was failure on the part of VA to timely and/or properly treat the claimed disease or disability, allowed the disease or disability to continue to progress. 

First, the examiner stated that there has never been any evidence that the Veteran has a chronic liver disease due to viral Hepatitis A, B, or C. The Veteran was diagnosed with primary biliary cholangitis, previously called primary biliary cirrhosis. The examiner reviewed all of the objective treatment records of the Veteran, which showed that the Veteran had elevated liver function tests within the first three months of presentation to the VA medical center in April 1997. A review of the Veteran's laboratory testing between July 1997 and March 2001 showed fluctuation of SGPT (alt) and SGOT (ast) between modest elevation and being normal, with normal alkaline phosphatase levels. The Veteran was asymptomatic from a GI standpoint during this period (except for heartburn complaints, which resulted in a GI referral for EGD in 2001), and his GI physician noted normal liver span, with no other comments. 

Treatment notes between 1997 and 2003 also note nearly daily alcohol use, with multiple primary care physician notes recording Veteran's daily and continued alcohol use. On January 27, 2003, it was noted that the Veteran had continued abnormal LFT's and continued alcohol use; his primary care physician referred the Veteran for an abdominal ultra sound and GI consult. The ultrasound showed hepatomegaly consistent with chronic inflammation. Follow up lab work revealed findings suggestive of an auto-immune hepatitis. A liver biopsy completed in April 2004 also showed fatty changes and chronic inflammation, with differential including drug reaction, auto-immune hepatitis and chronic infection. The Veteran was started on steroids for treatment of the auto-immune hepatitis, per his GI physician's recommendation. 

Records show that after completing the steroid course and tapering off the treatment in February 2005, his LFT's had normalized and the Veteran remained asymptomatic. On a routine follow up in by his GI physician in April 2006, the Veteran's LFT's had become elevated once again, and the Veteran was started on Prednisone and Azathioprine. Subsequent treatment notes showed that the Veteran was unable to tolerate Azathioprine due to nausea and that he declined further medication on his own in 2007. The Veteran was restarted on Prednisone, but declined the medication in 2008 due to concerns regarding the medication's effect on his glucose levels (the Veteran had a history of diabetes). A trail of Imuran was started, but the Veteran reported he could not tolerate the medication due to nausea and vomiting, and this was also declined in 2009. 

In 2010, as the Veteran's LFT's began to rise, GI notes indicate that the Veteran still declined to take Prednisone, Azathioprine, or Imuran. Therefore, a cat-scan was ordered in May 2010, to assess for cirrhosis and the study was negative for cirrhosis and any liver masses. The Veteran was seen by a different VA hepatologist for a second opinion. This hepatologist noted that there was no evidence of cirrhosis, but the repeated labs were suggestive of PBC, which was also an auto-immune condition. Follow up notes indicated that the Veteran was started on Ursodiol in July 2010, but when we was seen again in January 2011, the Veteran stated that he ran out of the medication and had not taken it for months. 

The Veteran was first found to have liver mass and findings consistent with cirrhosis by an October 27, 2011 ultrasound, done as a routine follow up to assess for PBC progression. The Veteran then underwent an abdominal cat-scan on November 11, 2011 and an MRI on March 22, 2012. The Veteran was referred to interventional radiology on March 28, 2012, with a confirmatory liver biopsy diagnosing hepatocellular carcinoma. 

The Veteran underwent a successful TACE/RFA of the HCC lesion, and was referred for consideration for a liver transplant in 2012. After numerous required evaluations and several months of tobacco abstinence, the Veteran was accepted into the liver transplant program and his name was added to the transplant list on August 1, 2013. The Veteran missed an opportunity for a transplant on October 29, 2014, because he could not be reached at any of his designated numbers. He did undergo an OLT (liver transplant) on December 19, 2014, and since this time he has had one episode of an acute rejection, which resolved with a steroid treatment. In May 2015, he was treated for a superficial infection, which could have been related to diabetes and/or the OLT treatment. Most recently, the examiner noted that the Veteran was found to have a metastatic HCC of the lymph nodes, which was treated with Sorafenib. 

Second, after doing a thorough and complete evaluation of the Veteran's medical history of record, the examiner opined that it was less likely than not that that the Veteran's chronic liver disease was caused by treatment at the VA Medical Center. The examiner based this conclusion on the fact that the Veteran was ultimately diagnosed with PBC, which is an autoimmune condition, which appeared to have a genetic/familial component, and is proposed to have environmental triggers. As such, it seems unlikely, according the examiner that any VA treatment would have contributed to the condition's onset. 

The examiner also opined that it was less likely than not that the Veteran's chronic liver disease was worsened as a result of treatment at the VA Medical Center. Based upon a review of the objective medical evidence of record, as well as peer-reviewed medical literature (www.aasld.org/sites/default/files/guideline_documents/PrimaryBillaryCirrhosis2009.pdf ), the worsening of the Veteran's condition (PBC) does not appear to be attributable to VA treatment, or lack of timely or appropriate VA treatment. The examiner made this conclusion based on the fact that the Veteran was initially diagnosed with AIH in 2004, not PBC. The two conditions have considerable overlap in expected diagnostic lab values, symptomatology or lack of symptomatology in patients, and both cause inflammatory changes in biopsy specimens. It is the examiner's opinion that there was no delay in PBC diagnosis, because on initial evaluation in by his GI physician in 2004, when he was diagnosed with AIH, the Veteran was negative for AMA, which is positive in 95% of PBC patients. The Veteran's initial labs also showed no evidence of elevated alkaline phosphatase, another abnormal lab finding with favors a diagnosis of PBC. In addition, a diagnosis of PBC or AIH requires that alternate diagnoses, such as alcohol are ruled out. The pattern of abnormal LFT's from1997-2003, in the presence of continued alcohol use, obesity, use of potentially hepatotoxic medications, and absence of GI symptoms, obscured a diagnosis of AIH or PBC. 

Further, the examiner noted that the Veteran was treated with the medications recommended in clinical treatment guidelines for AIH. Initially, it appeared as thought the Veteran was responding well to the treatment for AIH, and it was not until he relapsed, one year later, and began having trouble tolerating medications for AIH, that he was reassessed and labs were rechecked by his GI physician. The examiner noted that references indicated that intolerable side effects are acceptable reason for discontinuation of treatment, or to seek alternative therapy. 

Upon re-evaluation in 2010, the Veteran was AMA positive, consistent with PBC. He was prescribed Ursodiol for PBC as soon as he was diagnosed, but did not take the medication continuously. Further, the examiner commented on the fact that the Veteran received frequent follow ups with his primary care physician, GI physician, and the liver transplant team, except for when he "was too busy" or had turned his phone off, which resulted in delays in treatment. Screening test, such as labs, abdominal ultra sounds, cat-scans, MRI's all appear to have been performed routinely and in a timely manner. 

Lastly, the examiner noted that the Veteran's progression to cirrhosis and hepatocellular carcinoma is a documented risks associated with PBC and AIH. Since the Veteran was monitored for these conditions, and underwent prompt evaluations for abnormal findings, the examiner did not believe that there were any delays in diagnosis or treatment. 
The examiner also opined that it was less likely than not that the Veteran's disability of chronic liver disease was the result of carelessness, negligence, lack of skill or similar incidence of fault on the part of the attending VA personnel. The examiner came to this conclusion because there were no identifiable substantive delays in diagnosis or treatment of the Veteran. Upon identification of abnormal LFT's, the Veteran was advised to lose weight and discontinue any consumption of alcohol. The Veteran had difficulty complying with these recommendations. Repeat LFT's were checked between 1997-2003, with fluctuations between normal and modestly elevated. When the Veteran's abnormal LFT's became persistent, and started to reach the 4-5x the ULN, he was referred to a GI specialist for further evaluation. The Veteran underwent an evaluation that diagnosed him with likely autoimmune hepatitis, within 3-4 months, and he initially responded to the treatment. The Veteran later relapsed, noted by his inability to tolerate the medication, but he did not worsening LFT's at this time. When the LFT's became persistently elevated to 4-5x ULN, he was seen by a second VA Medical Center hepatologist, who then diagnosed PBC, after a second work up with different lab results. At that time, he was started on the recommended medications, and he had an abdominal cat-scan done on July 27, 2010, which reported no cirrhosis and no liver masses. Upon re-evaluation on October 27, 2011, a suspicious mass was documented and further work-ups led to a HCC diagnosis. The recommended treatment of TACE/RFA was completed, with a plan for a liver transplant referral. 

Standard protocol, as noted by the examiner, in the process of liver transplant evaluation is reassessment of disease status with repeat imaging, to ensure that there is no spread and that OLT could therefore potentially be curative. Imaging is generally done at intervals of at least three months, in order to be able to assess for any reoccurrence of spread, when comparing to prior studies. Likewise, the transplant approval process involves numerous evaluations by specialist, such as social workers, mental health consultants, cardiologist, infection disease specialist, and many others, to ensure that the patient, the Veteran in this case, is a good candidate for this life-changing procedure, and will be able to follow the necessary post-transplant procedures. The Veteran's transplant approval was delayed, until he could show sustained tobacco abstinence, which is a contra-indication to transplantation. The examiner explained that the length of time a patient is on a waiting list for a liver transplant varies with a patients MELD score (medical urgency), ABO blood type, proximity to donor organ, and other factors; the typical wait time for a liver transplant is 12-26 months. The Veteran, in this case, was referred for consideration for a liver transplant within 3-4 months of the time he was diagnosed with cirrhosis and HCC. He received his liver transplant within 16 months after he was initially listed. 

The examiner also reviewed medical literature that suggest that around 20 percent of patients undergoing potentially curative liver transplant after a diagnosis of HCC will ultimately be diagnosed with metastic HCC, attributable to microscopic spread outside of the liver. As such, based upon all the above, the examiner opined that that there was no evidence that the Veteran's disability from chronic liver disease was the result of carelessness, negligence, lack of skill, or similar incidence of fault on the part of the attending VA personnel. 

The examiner also opined that it was less likely than not that the Veteran's disability from his chronic liver disease resulted from an event that could not have been reasonably foreseen by a reasonable health care provider. This is because the Veteran's need for a liver transplant to treat his cirrhosis and HCC was foreseeable and anticipated by treating physicians at the VA medical center. The Veteran's acute liver rejection post-operative was predictable sequelae of a liver transplant, which was promptly and successfully treated. The Veteran's metastic HCC was detected via a routine surveillance study; since reoccurrence is seen in around 20 percent of HCC patients, it is an event for which patients are monitored for. 

It was also less likely than not that the Veteran's chronic liver disease and disability was allowed to progress due to failure of the VA medical center to diagnose and timely treat the Veteran's condition. This is because the Veteran's normal LFT's were appropriately evaluated, soon after he established care at the VA medical center in 1997, through his subsequent diagnosis with AIH and then PBC. The Veteran continued to receive close GI follow-up since 2004. Based upon the examiner's review of the records, there were no lapses in care during this diagnosis or during his subsequent treatment. 

As noted above, in order for a claim pursuant to 38 U.S.C.A. § 1151 to be granted, it must be determined that an additional disability occurred as a result of carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on VA. Pursuant to 38 C.F.R. § 3.361, this can be shown by establishing that VA treatment proximately caused an additional disability, and that (1) VA failed to exercise the degree of care that would be expected of a reasonable health care provider; or (2) VA furnished the hospital care, medical or surgical treatment, or examination without the Veteran's informed consent. 

The evidence of record does not show that the Veteran has an additional disability that is related to his liver transplant that was not an expected side effect or progression of the disease. The examiner that evaluated his claim stated that the Veteran's acute liver rejection post-operative was predictable sequelae of a liver transplant, which was promptly and successfully treated. The Veteran's metastic HCC was detected via a routine surveillance study; since reoccurrence is seen in around 20 percent of HCC patients, it is an event for which patients are monitored for. Further, the Board has reviewed the Veteran's treatment notes and has found that they do not reveal an additional disability due to his surgery; the Veteran had additional disabilities due to the progression of his disease. Further, as noted by the VA examiner, the Veteran's normal LFT's were appropriately evaluated, soon after he established care at the VA medical center in 1997, through his subsequent diagnosis with AIH and then PBC. The Veteran continued to receive close GI follow-up since 2004. Based upon the examiner's review of the records, there were no lapses in care during this diagnosis or during his subsequent treatment. 

There is no opinion of record, other than that of the Veteran that he suffers from an additional disability that was not a predicted side effect or progression of liver disease. The Board acknowledges that laypersons are sometimes competent to provide opinions regarding such medical matters as diagnosis and etiology. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). However, the Veteran's lay assertions about residual effects of his surgery are not competent evidence in this matter. This a complex medical question that is beyond the scope of law observation. An opinion of this magnitude would involve an analysis of surgical documents, treatment records, laboratory testing and x-ray, cat-scan or MRI analysis. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir. 2007). In expressing an opinion as to a diagnosis, causation and negligence, the Veteran is not reporting readily apparent symptoms, nor is he reporting a contemporaneous medical diagnosis or describing symptoms that were later diagnosed by a medical professional. See Jandreau v. Nicholson, 492 F.3d at 1377. The Veteran has not demonstrated he has knowledge of the acceptable medical practices in diagnosing and treating liver disabilities, performing surgery, or diagnosis medical conditions that are not observable to a lay person, such that his statements would be competent, nor has he indicated that the failure in the standard of care was such that it would be readily apparent to a layperson. See OGCPREC 05-01.

The most probative evidence in this complicated matter is the expert opinion. The medical opinion from the hepatology medical expert explains his conclusion with reliance upon the correct factual history in pertinent regards, reference to the medical standard of care, and also explanation that the evidence of record does not reveal any complications as a result of the Veteran's transplant, or further complications as result of the progression of his liver disability, which, in the opinion of the examiner, adequately followed and treated by the VA physicians and specialist. Further, the examiner opined that there was no evidence of carelessness, negligence, lack of proper skill, error in judgement or similar fault on the VA's part. The acceptable treatment plans were followed, the Veteran was closely monitored since he began his treatment with the VA in 1997, and here were no lapses in care during this diagnosis or during his subsequent treatment. Nieves-Rodriguez v. Peake, 22 Vet. App. 295 (2008).

The preponderance of the probative competent evidence in the record that addresses these questions weighs against the Veteran's claim. The opinion is by a medical professional, and the opinion identified by the Board as most probative reflect familiarity with the pertinent facts of record and is accompanied by rationales that refer to accurate factual data for support. The Board finds that the VA examiner's opinion is the most probative opinion on the essential medical questions in this matter and is more persuasive than the contrary opinion of the Veteran.

Section 1151 contains two causation elements: a Veteran's disability must not only be "caused by" the hospital care or medical treatment he received from VA, but also must be "proximate[ly] cause[d]" by the VA's "fault" or an unforeseen "event." See 38 U.S.C.A. § 1151 (a)(1). Based upon the evidence of record, it has not been shown that the Veteran's current liver disability is caused by the hospital care or medical treatment he received from VA. As such the first element of causation required under § 1151 has not been met. Since the Board has made and initial determination that an additional disability was not caused by VA, the Board is not required to make a finding as to whether the event in question was reasonably foreseeable. See 38 C.F.R. § 3.361 (c); Loving v. Nicholson, 19 Vet. App. 96, 99-100 (2005).

In light of the foregoing, the Board concludes that the preponderance of the evidence is against the claim of entitlement to compensation under 38 U.S.C.A. § 1151 liver disease. Accordingly, that claim must be denied.

Duties to Notify and Assist 

When VA receives a complete or substantially complete application for benefits, it must notify the claimant of the information and evidence not of record that is necessary to substantiate a claim, which information and evidence VA will obtain, and which information and evidence the claimant is expected to provide. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a). See also Quartuccio v. Principi, 16 Vet. App. 183 (2002)

VA's duty to notify was satisfied through notice letters that fully addressed all notice elements. These letters informed the Veteran of what evidence was required to substantiate his claim and of the Veteran's and VA's respective duties for obtaining evidence. The Veteran was requested to submit any evidence in his possession and has been afforded a meaningful opportunity to participate effectively in the processing of his claim and given ample time to respond. 

All post-service VA and private treatment records identified by the Veteran have also been obtained. The Veteran has not identified any additional records that should be obtained prior to a Board decision. Therefore, VA's duty to further assist the Veteran in locating additional records has been satisfied. See 38 U.S.C.A. § 5103A (d); see also 38 C.F.R. § 3.159 (c)(4) (2016). 

The Veteran was provided a VA examination November 2015, which is adequate for the purposes of determining entitlement to compensation under 38 C.F.R. § 1151 as it involved a review of the Veteran's pertinent medical history, and provide the requested opinions with supporting rationale. See generally Barr v. Nicholson, 21 Vet. App. 303, 311 (2007). 

In light of the foregoing, the Board is satisfied that all relevant facts were adequately developed to the extent possible; no further assistance to the appellant in developing the facts pertinent to the issue on appeal is required to comply with the duty to assist. 38 U.S.C.A. §§ 5103 and 5103A; 38 C.F.R. § 3.159.


ORDER

Entitlement to compensation under 38 U.S.C. § 1151 for liver disease is denied. 




____________________________________________
CHERYL L. MASON
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs